IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 10, 2015 Session

## CHRISTOPHER MAURICE KIBBE v. MARY CAROLYN KIBBE

**Appeal from the Circuit Court for Washington County**
**No. 30512     Hon. Jean A. Stanley, Judge**

---

**No. E2014-00970-COA-R3-CV-FILED-APRIL 28, 2015**

---

In this divorce action, the husband seeks reversal of the allocation of marital debt, the parenting plan, and the grant of alimony in futuro. The wife requests alimony in solido. We affirm the trial court's decision on all issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN. W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

Nicholas D. Bunstine, Knoxville, Tennessee, for the appellant, Christopher Maurice Kibbe.

Judith Fain, Johnson City, Tennessee, for the appellee, Mary Carolyn Kibbe.

## OPINION

### I.     Background

Christopher Maurice Kibbe ("Husband") and Mary Carolyn Kibbe ("Wife") were married in 1998. Two children, Dylan ("Son") and Lara ("Daughter"), were born during the marriage. Throughout the marriage, Husband was a commercial pilot, while Wife stayed home to care for the children, specifically Daughter, who was classified as special needs and needed constant care and supervision.

In March 2012, Husband sought a divorce after approximately 14 years of marriage. Husband alleged that he was entitled to a divorce based upon Wife's inappropriate marital conduct and irreconcilable differences. Wife responded by filing a counter-complaint for divorce, alleging that she was entitled to a divorce based upon

Husband's inappropriate marital conduct and adultery. The parties each submitted a proposed parenting plan order. Husband requested equal parenting time, while Wife requested designation as the primary residential parent with Husband receiving 120 days of co-parenting time with Son and 80 days of co-parenting time with Daughter.

During the pendency of the hearing on the competing complaints for divorce, Husband was diagnosed with an adjustment disorder with a mixed anxious and depressed mood and was placed on disability. A hearing on the complaints was held over the course of three days in January and February 2014.

Clinical psychologist Steven Lawhon, Psy.D. testified that he met with Husband approximately six times, starting in July 2013. He stated that he diagnosed Husband as suffering from an adjustment disorder with a mixed anxious and depressed mood as a result of the ongoing divorce proceedings, medical issues, and other stressors relating to Husband's family and profession as a pilot. He stated that he submitted his findings to Husband's insurance provider and that Husband was no longer able to serve as pilot based upon his diagnosis. He believed that Husband should recover from the disorder in approximately six months. He recalled that his diagnosis was based upon his interactions with Husband and letters from Husband's other medical providers.

Husband, who was 51 years old at the time of the trial, testified that he had a Bachelor of Science degree and that he completed several post-graduate aviation courses to receive the training necessary to pilot airplanes. He was currently employed by FedEx. He claimed that he was not able to control his monthly schedule, which was provided to him ten days before each month. He explained that he often flew internationally for an approximate 7 to 17 day rotation, which amounted to a 75-hour workweek.

Husband testified that he suffered from high blood pressure, cholesterol, and an injured knee, which would require knee replacement surgery. He had a heart attack in 2006 that rendered him disabled and unable to work for approximately 20 months. In order to resume his position at FedEx, he submitted to an arduous re-application process that included strenuous medical testing. He was required to undergo medical testing every six months to maintain his license. He asserted that his current diagnosis of adjustment disorder was a result of stressors related to his health, the stress inherent in his employment, family finances, their special needs daughter, and the divorce.

Husband testified that Wife was responsible for the family finances and that he agreed to an arduous work schedule because she often complained that they did not have enough income. He asserted that from 2008 through 2011, he received in excess of $200,000 per year. He related that he deposited his income into their joint checking account but that Wife's spending habits simply exceeded his substantial income. He

explained that from 2007 through 2008, he sold property and a business in Florida to cover approximately $70,000 in credit card debt but that by November 2011, Wife accumulated an additional $90,000 in credit card debt. He stated that Wife rebuffed his suggestion to consult a credit card counselor and control their spending. He claimed that by 2013, Wife filed for bankruptcy because she had amassed approximately $121,000 in credit card debt.

Husband testified that he also experienced stress related to his family. He explained that Son was diagnosed with leukemia in 2000 and that they discovered Daughter's special needs when she was born in 2002. He sought a divorce because Wife refused to communicate with him and because with the exception of two occasions, he had not enjoyed a physical relationship with Wife since approximately 2009. He explained that they lived in separate areas of the house when he returned home. He stated that he parented the children, while Wife recuperated from her day-to-day responsibilities.

Husband admitted that he began a relationship with Teresa Schutte in January 2012. He stated that Ms. Schutte was a family friend who lived in Ocoee, Florida. He often visited her in Florida and also traveled with her to Amelia Island, to Charleston, South Carolina, and to Asheville, North Carolina. He also visited with her when he had a layover in Paris. He stated that since 2012, he had likely spent $10,000 on his relationship with Ms. Schutte. He admitted that Ms. Schutte was his beneficiary on his $1,800,000 life insurance policy at one time but that Wife was the current beneficiary.

Husband identified his proposal for the division of the marital property and debts. He acknowledged that he received the 2011 tax refund of approximately $9,100 and the 2012 tax refund of approximately $10,500 and that he did not remit any portion of either refund to Wife. He admitted that he was expecting his 2013 tax refund of approximately $10,100 in a few days and that he intended to spend the money on his current bills in order to remain solvent. He conceded that he received approximately $50,000 as a result of refinancing the house in March 2012 and that he did not remit any portion to Wife. He also conceded that he received approximately $8,000 from his father and a $20,000 personal loan from his retirement while the divorce was pending. He explained that he used the money from the refinancing, his father, and his retirement to pay for living expenses and $75,037 in home improvements. He agreed that some of the home improvements were paid through other sources, including approximately $31,600 in debt from a line of credit, a signature loan, and a personal loan. He believed that the debts should be paid from the sale of the house.

Husband identified his affidavit of income and expenses, reflecting expenses of $13,997.50 per month and a gross income of $12,750 per month. He stated that since

completing his affidavit, his net pay had decreased from $10,100 to $9,453 as a result of his placement in a different tax bracket. He acknowledged that some of his expenses would decrease as a result of the divorce and that Wife's car loan with a monthly payment of $514 would be paid in full in approximately six months. He agreed to a spousal support obligation until Wife was able to access his pension benefits at the age of 52, at which time she could recoup approximately $1,700 per month. He believed that Wife was capable of working and should work to support herself.

Relative to the children, he requested equal co-parenting time. He explained that since October 2013, he and Wife had essentially shared parenting responsibilities with alternating weeks of co-parenting time. He believed that the arrangement had been very successful and that he was capable of addressing Daughter's special needs. He acknowledged that Daughter suffered from seizures, was unable to speak, and relied on an iPad and gestures to communicate. He admitted that he did not require Daughter to use the iPad for communication even though use of the iPad was recommended by her therapists. He also admitted that Wife was more involved in Daughter's therapy and that he was unfamiliar with several of Daughter's current training methods. He acknowledged that he left Daughter in the car on one occasion and that she had wandered away on another occasion while in his care. He insisted that Daughter did not require qualified caregivers. He explained that one simply had to be made aware of her unique needs and given instructions regarding her care.

Wife, who was 48 years old at the time of the hearing, testified that the lack of intimacy in their marriage was a result of her breast reconstruction surgery and a partial mastectomy in 2010 and her complete hysterectomy in 2011. She attempted to initiate a physical relationship with Husband, but he never initiated any form of physical affection. She also scheduled a date night each time he returned home and gave him massages.

Wife testified that Husband knew where she kept the information concerning their finances and that he was free to investigate their spending habits. She also spoke with him every six or eight months about the finances and informed him of their current debt accumulation. She stated that she paid the household bills and Husband's credit card bills before she addressed their other debt. She explained that Husband had filed for bankruptcy before their marriage and that they were attempting to reestablish his credit. She claimed that they opened credit cards in her name as a result of Husband's bad credit history. She asserted that they paid for vacations, household expenses, and her medical procedures with her credit cards. She acknowledged that they spent more than their income and that their spending habits caused stress in their marriage.

Wife claimed that Husband ceased payment on her credit cards in June 2012 and forced her to file for bankruptcy. At that time, she had amassed approximately $121,000

in credit card debt. She stated that Husband deposited his paychecks into his account and then transferred money to their joint account to cover minimal living expenses for her and the children. He also provided her with $250 and Wal-Mart gift cards to pay for groceries. In contrast, she claimed that he spent approximately $27,000 in 2012 and $26,000 in 2013 on travel and entertainment with Ms. Schutte.[1]

Wife testified that Husband was home for approximately three days a month in 2011 and 2012 and that he was home for five days a month in 2013. She claimed that Husband never worked with Daughter in a therapeutic way and that he only began the alternating weekly co-parenting schedule in November 2014. She conceded that he had met with Daughter's therapists and that he enjoyed a loving relationship with Daughter.

Wife testified that Daughter, who was 11 years old, was developmentally and intellectually disabled. She stated that Daughter was unable to communicate and in need of constant supervision. She related that she spent a substantial amount of time each day researching ways to enrich Daughter's life. She co-founded the first parenting network for children like Daughter and was on the board of a similar organization. She worked with Daughter to develop her use of the iPad for communication purposes and with Daughter's therapists to reinforce the current training methods. She claimed that Husband did not provide the constant supervision and consistency that Daughter required. She explained that Daughter was often unsupervised while with Husband and showed signs of regression when she returned from visits with him.

Wife identified her income and expense statement, which reflected an income of $100 per month and expenses of $7,223 per month. She acknowledged that she submitted an income and expense statement in bankruptcy court that reflected an income of $190 per month and expenses of $4,010 per month.

Wife stated that she was licensed to teach in Florida and that she had also worked in medical billing. She explained that her license to teach and medical billing certificate had since expired. She stated that she worked for approximately one year since Daughter was born. She explained that Husband, his parents, or a friend from church supervised Daughter while she worked. She estimated that adequate supervision for Daughter would cost approximately $25 per hour. She had applied for employment with the Johnson City School System and also periodically served as a substitute teacher. Her ability to work was limited because of Daughter's need for constant supervision. She claimed that she could not afford adequate childcare even if she were to find full-time employment. She currently received $3,500 per month from Husband. She claimed that she was unable to provide for herself and the children without additional help from family and friends.

---

[1] Husband later testified that he spent approximately $17,025 in 2012 and $8,976 in 2013 on travel and entertainment with Ms. Schutte.

Following the presentation of the above evidence, the trial court granted Wife's request for divorce and designated her as the primary residential parent for the minor children. The court awarded Husband equal co-parenting time with Son and 124 days of co-parenting time with Daughter. The court then divided the marital assets, awarded Wife alimony at the rate of $2,500 per month until her death or remarriage, and awarded Wife child support at the rate of $1,742 per month. The court held that each party was responsible for their attorney fees and awarded each attorney a lien against the proceeds from the sale of the marital residence. The court found that each party was also responsible for any debt obligations in their name. This timely appeal followed.

## II.    ISSUES

We consolidate and restate the issues raised on appeal as follows:

A.    Whether the final judgment entered by the trial court should be set aside because it did not reflect the ruling of the court.

B.    Whether the trial court erred in its allocation of the marital debt.

C.    Whether the trial court erred in the creation of the parenting plan.

D.    Whether the trial court erred in awarding Wife alimony in futuro.

E.    Whether Wife is entitled to alimony in solido.

F.    Whether either party is entitled to attorney fees on appeal.

## III.    STANDARD OF REVIEW

After a bench trial, we review a trial court's findings of fact de novo with a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We afford great deference to a trial court's credibility determinations because the court is in the best position to observe witnesses and evaluate their demeanor. *Hughes v. Metro. Govt. of Nashville and Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). We review questions of law de novo with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006).

Trial courts are vested with a great deal of discretion when classifying and dividing a marital estate. Typically, the court's decision will not be disturbed on appeal

unless the decision is contrary to the preponderance of the evidence or is based on an error of law. *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002).

Likewise, trial courts have broad discretion to fashion parenting plans that best suit the unique circumstances of each case. *See Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'" *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Thus, appellate courts should only set aside the trial court's judgment in such cases when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

Trial courts also have broad discretion in awarding spousal support. *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004). "Accordingly, '[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes.'" *Bogan*, 60 S.W.3d at 727 (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). The role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Id.* At 733. Thus, an appellate court must review a trial court's decision regarding alimony using the deferential abuse of discretion standard. *See Bratton*, 136 S.W.3d At 605. If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

## IV. DISCUSSION

### A.

As a threshold issue, we must address Husband's contention that the final judgment entered by the trial court should be set aside because it did not accurately reflect the ruling of the court as evidenced by the oral findings of fact, the memorandum opinion, and the addendum to the memorandum opinion. Wife responds that the trial court accepted her proposed judgment of divorce and made changes to reflect its ruling before entering the final judgment.

"A Court speaks only through its written judgments, duly entered upon its minutes. Therefore, no oral pronouncement is of any effect unless and until made a part

of a written judgment duly entered." *Sparkle Laundry & Cleaners, Inc. v. Kelton*, 595 S.W.2d 88, 93 (Tenn. Ct. App. 1979); *see also Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) (citing *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001) ("Trial courts, as a general matter, speak through their orders and judgments.")). While "findings of fact, conclusions of law, opinions, and orders prepared by trial judges themselves are preferable to those prepared by counsel," this was not a case where the trial court simply allowed counsel to blindly prepare the final judgment. *Smith v. USH of Lakeside, Inc.*, 439 S.W.3d 303, 314 (Tenn. 2014). Here, the trial court issued findings of fact on the record, a memorandum opinion, and an addendum to the memorandum opinion. The court also made additional changes and alterations to the final judgment that was submitted for approval. With these considerations in mind, we conclude that the final judgment at issue on appeal accurately represented the court's final decision.

In so concluding, we must also address Husband's contention during oral argument that Wife's counsel engaged in ex parte communications with the trial court following trial but before entry of the final judgment. Wife's counsel filed a written response providing that she simply informed the court's assistant that the division of the 2013 tax refund was not addressed in the memorandum opinion and that opposing counsel was informed of the communication. The record confirms that Husband requested the refund and that the court addressed the issue in the addendum as follows:

> The Court has been informed that the parties' 2013 tax refund is soon to be deposited in the husband's bank account. It is therefore, ORDERED that the amount of the 2013 income tax refund shall be divided equally between the parties.

The court also confirmed the division of the tax refund in the final judgment. Based on these facts, we do not believe that the communication was improper or that the trial court violated Rule 10, Canon 2.9 of the Code of Judicial Conduct.

### B.

Husband argues that the trial court erred in assigning the signature loan and the personal loan to him. He notes that he requested that these marital debts be paid from the sale of the marital residence. He also argues that he should have received the 2013 tax refund. Wife responds that the trial court's division of the marital debts was equitable given Husband's extensive waste of money visiting and traveling with Ms. Schutte. She claims that he retained numerous marital funds for his own purposes and could not account for the way in which he spent the funds. She also argues that the trial court did not err in dividing the 2013 tax refund.

"Tennessee is a 'dual property' state because its domestic relations law recognizes both 'marital property' and 'separate property.'" *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010) (citing *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009); Tenn. Code Ann. § 36-4-121)). The division of the parties' marital estate begins with the classification of the property as separate or marital; separate property is not subject to division because it is not part of the marital estate. *Id.* Once property has been classified as marital property, the court is to place a reasonable value on the items subject to division. *Edmisten v. Edmisten*, No. M2001-00081-COA-R3-CV, 2003 WL 21077990, at *11 (Tenn. Ct. App. May 13, 2003). Marital property, once valued, must be divided equitably between the parties without regard to fault. Tenn. Code Ann. § 36-4-121(a)(1); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). A division of marital property in an equitable manner does not require that the property be divided equally. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn.2002). An equitable division of property must reflect consideration of the factors in Tennessee Code Annotated section 36-4-121(c).[2] *Kinard*, 986 S.W.2d at 230.

---

[2](c) In making equitable division of marital property, the court shall consider all relevant factors including:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

Marital debt is subject to equitable division in the same manner as marital assets. *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003). In *Alford*, the Tennessee Supreme Court defined marital debt consistent with the definition of marital property, which is defined by statute as property acquired by either spouse during the course of the marriage up to the date of final hearing and owned by either or both spouses as of the date of the filing of the complaint for divorce. Tenn. Code Ann. § 36-4-121(b)(1)(A). Debts incurred by either or both spouses during the course of a marriage are properly classified as marital. *Alford*, 120 S.W.3d at 811. They include debts incurred up to the date of the final divorce hearing. *Id.* at 813.

In allocating the debt, the court held that Husband's testimony concerning his use of funds to update the marital residence was not credible. The court noted that Husband also used marital funds to entertain his paramour. Upon review of the record and in consideration of the relevant statutory provisions, we are satisfied that the court did not err in its ruling regarding the debt or the division of the 2013 tax refund.

C.

Husband argues that the trial court erred in setting the residential schedule. He suggests that an award of equal co-parenting time would have been in the best interest of Daughter. He claims that he was actively involved in caring for Daughter and was capable of addressing her special needs. Wife responds that the trial court did not err in denying Husband's request.

The paramount concern in establishing a parenting plan is the best interest of the children. *See* Tenn. Code Ann. § 36-6-401(a). Our focus must be placed there. The testimony presented at trial reflected that Daughter enjoyed a healthy relationship with both parents. However, Wife was uniquely situated to provide the specialized care that Daughter needed. Questions remain as to whether Husband had the capacity to provide the constant supervision necessary to care for Daughter on a regular basis. The testimony presented at trial reflected that Husband left Daughter unsupervised, thereby exposing her to harm as a result of her special needs. Recognizing the court's broad discretion in this matter, we believe that the record supports the court's setting of the residential schedule. Accordingly, we affirm the decision of the trial court.

Husband also raised a number of issues relating to the details of the parenting plan, e.g., transportation, decision-making authority, the maintenance of his life insurance policy, and tax exemptions. He also questioned the court's adoption of Wife's parenting plan when it differed in some respects from the court's memorandum opinion. Having reviewed the record and applicable law, we conclude that these issues are without merit.

D.

Husband argues that the trial court abused its discretion in awarding alimony in futuro at the rate of $2,500 per month until Wife's death or remarriage. He claims that Wife was capable of finding employment and contributing to her support until she was able to recoup benefits from his pension. He notes that any childcare expenses incurred as a result of her employment would be shared by the parties. Wife responds that the trial court did not abuse its discretion in awarding alimony in futuro.

"Alimony" is defined, in pertinent part, by Black's Law Dictionary, 9th ed., as

> [a] court-ordered allowance that one spouse pays to the other spouse for maintenance and support . . . after they are divorced. Alimony is distinct from a property settlement.

Tennessee recognizes four different types of alimony: rehabilitative alimony, transitional alimony, alimony in futuro, and alimony in solido. Each type addresses a specific need. The trial court in this case awarded alimony in futuro. Alimony in futuro is a long-term form of spousal support. Tenn. Code Ann. § 36-5-121(f)(1). Alimony in futuro is typically awarded when a spouse is economically disadvantaged, but rehabilitation is not feasible, meaning that the disadvantaged spouse cannot achieve an earning capacity that will allow him or her to maintain an appropriate standard of living. *Id.* This type of alimony is awarded on a "long term basis or until death or remarriage of the recipient" spouse. *Id.*

In determining whether to award alimony, the court must first consider whether the spouse seeking alimony is economically disadvantaged. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003). "Once the trial court has found a party to be economically disadvantaged relative to his or her spouse, it must determine the nature, amount, length of term, and manner of payment of the award." *Id.* at 467. In setting the type, duration, and amount of support, courts are guided by the following list of factors:

> (1)  The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
>
> (2)  The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)     The duration of the marriage;

(4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)   The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)   The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)   Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i).

In addition to the factors found in Tennessee Code Annotated section 36-5-121(i), the two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson*, 76 S.W.3d at 342. When considering these two factors, the primary consideration is the disadvantaged spouse's need. *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999). Courts must also take into consideration the different roles a spouse may have in a marriage when considering an award of alimony. Tenn. Code Ann. § 36-5-121(c). "There are no hard and fast rules for spousal support decisions, and such determinations require a 'careful balancing' of the relevant factors." *Miller v. Miller*, No.

M2002-02731-COA-R3-CV, 2003 WL 22938950, at *3 (Tenn. Ct. App. Dec. 10, 2003) (citing *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998)).

A number of the support factors weigh in favor of affirming the alimony awarded to Wife. Unlike Husband, she lacked funds from sources other than her division of the marital property to sustain her. Tenn. Code Ann. § 36-5-121(i)(1), (2). The marriage was of a long duration, namely 14 years. Tenn. Code Ann. § 36-5-121(i)(3). Wife's position as Daughter's caretaker impeded her ability to find suitable employment. Tenn. Code Ann. § 36-5-121(i)(6). Wife also made substantial contributions to the marriage as a homemaker. Tenn. Code Ann. § 36-5-121(i)(10). The trial court found that Husband was at fault for the divorce. Tenn. Code Ann. § 36-5-121(i)(11). The remaining factors appear equally weighted or inapplicable. Indeed, the Parties were both nearing retirement age and suffered from numerous ailments. However, the record reflects that Wife was economically disadvantaged as compared to Husband and in need of support. Despite his disability, Husband had access to significant disability income through his employment with FedEx, thereby providing him with the ability to support Wife. Accordingly, we conclude that the trial court did not abuse its discretion in awarding alimony in futuro to Wife at the rate of $2,500 per month until her death or remarriage.

E.

Wife argues that the trial court erred in ordering her to pay attorney fees from the sale of the marital residence. She claims that she was entitled to an award of attorney fees as evidenced by Husband's earning potential, her lesser training for employment, the length of the marriage, Husband's adultery, and her position as Daughter's primary caregiver. Husband responds that the trial court did not abuse its discretion by requiring each party to pay their attorney fees. He claims that he did not have the ability to pay her attorney fees in addition to the other obligations imposed upon him by the trial court.

An award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony in solido. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 113 (Tenn. 2011); *Yount*, 91 S.W.3d at 783. The decision about whether to award attorney fees as alimony in solido is within the sound discretion of the trial court, and such an award will not be disturbed on appeal unless the evidence preponderates against factual findings that support the trial court's decision. *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995).

An award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith . . ." and that such an award is to ensure access to the courts. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 751 (Tenn. 2002) (quoting *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983)). If a party has adequate property and income, or is awarded adequate property in the divorce, from which to pay his or her own expenses, an award of attorney's fees may not be appropriate after consideration of all relevant factors. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000). The award of attorney's fees as additional alimony is most appropriate where the divorce does not provide the obligee spouse with a source of funds, such as from property division, with which to pay his or her attorney's fees. *Yount*, 91 S.W.3d at 783.

In this case, the trial court found considerable fault on the part of Husband, Wife's demonstrated need, and a disparate earning potential. However, the court declined Wife's request for attorney fees and ordered that such fees must be paid from the sale of the marital residence. In recognition of the court's discretion in such matters and the availability of funds from the sale of the marital residence to remit payment for the fees, we will not overturn the court's ruling. Accordingly, we affirm the court's order directing the parties to pay their respective attorney fees from the sale of the marital residence.

F.

The parties request attorney fees on appeal. Tennessee Code Annotated section 27-1-122 provides for an award of sanctions in the form of attorney fees when an appeal is determined to be frivolous. To find an appeal frivolous, the appeal must be wholly without merit and lacking in justiciable issues. *See Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977); *Indus. Dev. Bd. of Tullahoma v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). Additionally, a right to recover attorney fees in alimony and custody disputes was created in Tennessee Code Annotated 36-5-103(c), which provides,

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Exercising our discretion, we respectfully deny the competing requests for attorney fees on appeal. Following the lead of the trial court, we order that, to the extent the attorneys in this case are entitled to reasonable fees and expenses from their respective clients for appellate work, those fees will also be paid from the proceeds of the sale of the marital residence.

## V.    CONCLUSION

The judgment of the trial court is affirmed, and this case is remanded to the trial court pursuant to applicable law for enforcement of the court's judgment and for the collection of costs assessed below. Costs of the appeal are taxed one-half to the appellant, Christopher Maurice Kibbe, and one-half to the appellee, Mary Carolyn Kibbe.

_____
JOHN W. McCLARTY, JUDGE